AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

2020 SEP 11  PM 3: 46

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WESTERN DIV. DAYTON

| In the Matter of the Search of | )
| *(Briefly describe the property to be searched* | )
| *or identify the person by name and address)* | ) Case No. 3:20MJ432
| | )
| 249 Shank Avenue, Dayton, Ohio | )
| | )

## APPLICATION FOR A SEARCH WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment E

located in the _____Southern_____ District of _____Ohio_____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment F

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC s. 841(a)(1)/846 | possession with intent to distribute controlled substances/conspiracy |
| 21 USC 843(b) | use of a communication facility to facilitate a felony drug crime |
| 18 USC 922(g)(1)/1956/1957 | felon in possession of a firearm/money laundering |

The application is based on these facts:

See Attached Affidavit of Steven Lucas

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Steven Lucas, SA of the DEA
*Printed name and title*

Sworn to before me and affirmed in my presence via reliable electronic means.

Date: __9/11/20__                     _____
*Judge's signature*

City and state:  Dayton, Ohio                Sharon L. Ovington, US Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Steven Lucas, hereby duly sworn, declare and state:

### I.

### INTRODUCTION

1.     I am a Special Agent ("SA") of the Drug Enforcement
Administration ("DEA").   I therefore am an officer of the United
States who is empowered by law to conduct investigations of, and
to make arrests for, offenses enumerated in 21 U.S.C. § 878.

2.     I have been a DEA SA since June 2005 and currently am
assigned to the Dayton Resident Office.   Prior to becoming a SA,
I was a police officer with the Schererville Police Department
between 1995 and 2005.   During that time, I was assigned to the
DEA HIDTA group in Merrillville, Indiana for approximately 4
years.   I have conducted and participated in complex drug
trafficking conspiracy and money laundering investigations which
have resulted in arrests; execution of search warrants that
resulted in the seizure of narcotics, narcotics proceeds and
other evidence of narcotics trafficking activities; and
supervised the activities of cooperating sources (CS) that have
provided information and assistance resulting in narcotics
purchases. Through training and experience, I am familiar with
the manner in which persons involved in the illicit distribution

1

of controlled substances often operate. These people usually attempt to conceal their identities, as well as the locations at which they reside, and where they store controlled substances and the illegal proceeds derived therefrom. Through training and experience, I am familiar with the practices of narcotics distributors, whereby they attempt to conceal the true nature, source and location of proceeds of illegal activity, commonly referred to as money laundering. I have participated in several Title-III wiretap investigations and am familiar with how local drug traffickers and high level traffickers conduct transactions.

## II.

### PURPOSE OF AFFIDAVIT

3. I make this affidavit in support of search warrants associated with a drug trafficking organization operating in the greater Dayton, Ohio area. The application seeks the issuance of search warrants for the following addresses:

a.    236 Southerly Hills Drive, Englewood, Ohio (Target Residence 1). This property is more fully described in Attachment A, which is attached hereto and incorporated herein by reference;

b.    507 S Euclid Avenue, Dayton, Ohio (Target

2

Residence 2). This property is more fully described in Attachment B, which is attached hereto and incorporated herein by reference.

        c. 1107 Rossiter Drive, Dayton, Ohio (Target Residence 3). This property is more fully described in Attachment C, which is attached hereto and incorporated herein by reference;

        d. 4215 Sheller Avenue, Dayton, Ohio (Target Residence 4). This property is more fully described in Attachment D, which is attached hereto and incorporated herein by reference.

        e. 249 Shank Avenue, Dayton, Ohio (Target Residence 5). This property is more fully described in Attachment E, which is attached hereto and incorporated herein by reference. (collectively, "the Subject Properties").

    4. As detailed more fully below, based on the investigation in this case, I assert that there is probable cause to believe that evidence, contraband, and the fruits associated with the following federal felony offenses (collectively, "Target Offenses") is being stored at or can be found in the Subject Properties, including surrounding curtilage, outbuilding, or garages associated with those

properties:

      a.   Possession with intent to distribute a controlled substance and distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1);

      b.   Unlawful use of a communications facility, in violation of Title 21, United States Code, Section 843(b);

      c.   Conspiracy to commit offenses under Title 21, in violation of Title 21, United States Code, Section 846;

      d.   Felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1);

      e.   Money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957.

    5.   Based on my training and experience, as described above, I believe that there is probable cause to believe that the items listed in Attachment F will be found at the premises described above.

### III.

### SOURCES OF INFORMATION

    6.   I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation, conclusions I have reached based on my training and experience,

and upon information I believe to be reliable from the following sources: oral and written reports about this investigation and other investigations that I have received from federal agents as well as state and local law enforcement agencies; physical surveillance conducted by federal and local law enforcement agents, the details of which have been reported to me either directly or indirectly; telephone records, including toll records and subscriber information; information developed from cooperating sources; information developed from the use of pen registers and/or trap and trace; public records; and electronic global position satellite ("GPS") information for various cell phones.

      7.   Unless otherwise noted, when I assert that a statement was made, I received the information from a law enforcement officer who provided the information to me, either verbally or in a written report. The officer providing me with the information may have received the information by way of personal knowledge or from another source. Except where otherwise noted, the information set forth in this affidavit has been provided directly or indirectly by agents of the DEA or other law enforcement agencies. Whenever in this affidavit I assert that a statement was made, the information was provided by another

law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Moreover, the use of quotations to describe conversations herein either identify the actual words of the speaker or the interpretation of those words.

8. This affidavit does not include every fact known to me through the investigation, but rather those facts required to establish the probable cause for the issuance of search warrants requested above.

### IV.

### **PROBABLE CAUSE**

9. Since early 2020, the DEA Dayton has been investigating several individuals who appear to work together to traffic kilogram quantities of various controlled substances such as fentanyl, heroin, and methamphetamine in the Dayton, Ohio area. The group includes an individual currently on post-release control to the Ohio Department of Rehabilitation and Corrections - namely, Adrian Little.

10. During 2007-2008, Affiant participated in a drug investigation involving Little in the Dayton, Ohio area. DEA and the Greene County Drug Task Force arrested Little on drug

6

charges around that time. He was convicted of drug charges in state court and sentenced to over a decade in prison. During that investigation, agents learned that Little was being supplied by a large Mexican based drug trafficking organization with ties to Dayton, Ohio.

11. During early 2020, DEA received information that Little recently was released from Ohio state prison and once more was involved with distribution of drugs in Dayton, Ohio. Specifically, based on conversations with a confidential source ("CS") in March 2020, Affiant learned that Little was again trafficking drugs. CS stated that he/she has known Little for several years and was aware that Little had been released from Ohio state prison for drug trafficking. The CS advised that he/she had received information from Little's drug customers who indicated that Little had a Hispanic source of supply for drugs and that Little currently was obtaining kilogram quantities of fentanyl. It should be noted that the CS is considered reliable; the CS has provided information in the past that has led to arrests as well as the seizure of bulk amounts of controlled substances.

12. During June and July 2020, investigators again spoke with the CS. The CS confirmed that Little was still engaged in

7

drug trafficking activity and Little was working with other subjects including Mack Dorsey and DeAaron Davis. From a review of court records, Affiant knows that Dorsey has a lengthy criminal record, including a prior federal drug trafficking conviction in 2016. Dorsey's federal supervised release on that charge terminated in June 2020.

13. On March 29, 2020, Affiant was contacted by another DEA office which was conducting an investigation into laundering of drug proceeds by drug traffickers based outside of the United States. Affiant learned that a drug trafficker in Dayton, Ohio had secured a contract for pick-up and delivery of suspected drug proceeds to this drug organization. Based on the other investigation, the Dayton RO was able to utilize a DEA SA, acting in an undercover capacity ("UC"), to contact the Dayton based drug trafficker (later identified as being Little) and arrange the pickup of the suspected drug proceeds.

14. On March 31, 2020, the UC contacted a cellular telephone determined to be used by Little and arranged to meet with Little. During the recorded conversations between Little and the UC, Little stated that he had money for pick up but that he would not meet anywhere near Greene County. Little further stated that he previously was arrested and had served 12 years

8

in prison on a case out of Greene County. Little's reticence to meet in Greene County strongly indicates that the money that he sought to deliver constituted drug proceeds.

15. On March 31, 2020, the meeting took place between the UC and Little in Huber Heights, Ohio. Little delivered approximately $33,000 in US currency that was rubber banded and placed in a plastic bag. (Based on my training and experience, I know drug traffickers frequently bundle drug proceeds in this manner). Little had multiple recorded conversations using (308)209-0896 phone during the pickup operation. Based on my training and experience and the circumstances described above, I believe that Little was delivering drug proceeds for transport to his source of drug supply. Law enforcement obtained a court-authorized ping for (308)209-0896, and the location information for the phone - while not precise - placed it in the neighborhood of **Target Residence 1** during spring 2020.

16. Sometime after this transaction, Affiant contact APA concerning Little and confirmed his current status on post-release control. Additionally, Affiant inquired concerning any addresses that Little had disclosed as his residence to his parole officer. Little had advised APA that he resided at **Target Residence 2**. Little never mentioned or disclosed to APA

9

any connection that he had with **Target Residence 1**, **Target Residence 3**, or **Target Residence 5**. Based on my training and experience, I know that individuals who are on parole frequently hide from their supervising officer locations at which they engage in or transact illegal activity. Because many parolees such as Little are subject to search and seizure conditions, they do not want to advise the APA concerning these locations for fear that these alternate residences will be searched and their illegal activity discovered.

17.     During June 2020, the Dayton Residence Office was contacted by another DEA Office about a money pickup operation in which $150,000 in United States currency was to be laundered through a drug money courier. Affiant learned that a drug trafficker (FNU LNU) in Dayton, Ohio had secured a contract for the pick-up and delivery of suspected drug proceeds to this drug organization. Affiant learned that the other investigation had made recorded calls to 937-250-9642 to negotiate the pickup of the currency. Upon listening to the call, law enforcement confirmed that the voice of the user of 937-250-9642 matched that of Little during the March 2020 money pickup. Consequently, law enforcement concluded that Little was the individual in Dayton, Ohio planning to transfer the drug

10

proceeds. Surveillance described below further confirmed Little as the user of this telephone. To the knowledge of law enforcement, the money pickup did not occur.

18. On June 24, 2020, a court authorized GPS ping was obtained for cellular telephone 937-250-9642. During late June 2020, the pings placed the phone in the area of **Target Residence 1**. That same day, investigators conducted surveillance at **Target Residence 1** and subsequently observed Little departing that residence. On the same day, Little was observed parking near **Target Residence 2**. While agents did not physically observe Little enter the door of that residence, they believe that he went inside of it.

19. Affiant is aware of a cooperating defendant ("CD") who is pending federal charges and gave statements to federal investigators during June 2020. The CD provided information within his/her own personal knowledge, and the CD's statements have been corroborated by the CS. Later physical surveillance also corroborated CD's statements. According to CD, CD witnessed Little sell narcotics to an associate of the CD. CD further stated that Little also sold narcotics with Dorsey. Based on the CD's statements, the timeframe of his knowledge of Little concerned April and May 2020.

11

20.    In August 2020, federal agents obtained a tracking warrant for Little's 2014 Jeep.  (Prior to obtaining that warrant, agents had observed Little driving that vehicle).  Since obtaining the warrant to the present, Little's vehicle generally ends the day parked at **Target Residence 1** and does not move again until the morning.  While the car was not there every night during that period, it was there over most nights.  This circumstance strongly indicates that Little resides at **Target Residence 1** even though he never disclosed it to APA.

21.  Over that same time – namely, since installation of the tracking device during August 2020 and the present -- Little routinely travels to both **Target Residence 3** and **Target Residence 5** during the day time.  For instance, the Jeep which Little drives travelled to **Target Residence 3** and **5** as recently as September 10, 2020.  Affiant learned **Target Residence 3** was purchased in July 2020 by Macnificent Investments LLC.  Affiant learned that his company was created by Little in July 2020, and it listed **Target Residence 2** as the mailing address for the LLC. Little also purchased **Target Residence 5** in August 2020 through the LLC.  Affiant is aware drug traffickers often will open limited liability corporations and use them to facilitate transactions of property to hide the fact that drug proceeds are

being used to make the purchases. I have spoken with APA, and it indicated that they have no information concerning Little's employment status. Notably, while conducting surveillance of Little since April 2020, investigators have never observed him report to a job. Based on the foregoing, Affiant believes that Little purchased **Target Residence 3** and **Target Residence 5** with drug proceeds, not funds from legitimate employment.

22. During August 17, 2020, agents conducted surveillance at **Target Residence 4**. At that time, law enforcement observed a car arrive at **Target Residence 4** and its driver walk to the door of the residence. The driver briefly entered the residence and then left with a bag. The driver re-entered the car and pulled away. When a surveillance vehicle positioned itself behind the car, it immediately pulled to the side of the road and waited for the surveillance vehicle to pass. Moments later, surveillance observed a person, later identified as Dorsey, exit **Target Residence 4** talking on his cellular telephone. Dorsey looked up and down the street. Based on this chain of events, I believe that the person arrived at **Target Residence 4**, obtained drugs from Dorsey and drove away. Upon spotting surveillance units, the person contacted Dorsey who exited **Target Residence 4** to search for law enforcement.

13

23.    In late August 2020, investigators placed a pole-type camera facing **Target Residence 4**.  From that time to the present, law enforcement have observed Dorsey coming and going from the location on multiple occasions.  (DEA has confirmed that the utilities to **Target Residence 4** are also in Dorsey's name).  Additionally, throughout this same time, agents observed Little at **Target Residence 4** with Dorsey on multiple occasions. For instance, on August 28, 2020, Little was observed arriving at Target Residence 4 and meeting with Dorsey.  After the meeting, Little left the residence with a small package of unknown contents.  It should be noted that, around this time, CS confirmed that Little and Dorsey were trafficking drugs together.

24.    Additionally, during February 2020, Dayton Police executed a warrant at Dorsey's then address, located at 625 Kennelworth Avenue, Riverside, Ohio.  While drugs were not located inside of the residence during the search, police did recover methamphetamine outside of the house.  Additionally, as noted above, Dorsey has a lengthy criminal history including, possession of heroin, improper handling of a firearm, fleeing law enforcement and aforementioned federal drug conviction.

25.     In September 2020, CS advised Affiant that Dorsey and another individual were in an ongoing dispute.  The CS stated he/she has been told Dorsey intends to shoot/kill the subject and has made it known that he (Dorsey) has guns on him at all times.  Coupling this circumstance with Dorsey's involvement in the drug trade, Affiant believes it is highly likely that firearms are located at **Target Residence 4**.

26.     Based on the foregoing as well as my knowledge of drug trafficking modus operandi described below, I believe that Little, Dorsey, and others are currently engaged in a lengthy, ongoing drug trafficking scheme.  Little's involvement in one completed and one contemplated drop of drug trafficking proceeds is strongly indicative of his ongoing drug trafficking activity.  Indeed, he possessed a large sum of United States currency during spring 2002 and acquired two properties in the Dayton area during summer 2020 – namely, **Target Residence 3** and **Target Residence 5** – despite his apparent lack of employment.  Two individuals – the CS and CD, both of whom have been corroborated and deemed reliable – further implicate Little and Dorsey in drug trafficking activity.  That activity is linked to the Subject Properties.  Little lists **Target Residence 2** as a mailing address for the LLC that he uses as a likely front for

his drug trafficking activity and a means through which he can launder illegally gotten proceeds. **Target Residence 2** will likely contain, among other things, paperwork associated with the LLC that will reveal properties and assets that Little has acquired through the use of drug proceeds. Little appears to live at **Target Residence 1** and makes daily visits to **Target Residence 3** and **Target Residence 5**. He has not disclosed any of these three homes to the APA – a strong indicator that he has hidden contraband, including drugs, currency, and firearms at one or more of these residences. Additionally, Little's near daily visits to these locations further indicates that he keeps items of value to him at these homes – likely drugs, currency, and firearms. Location data has placed him or his vehicle at each of these residences on a frequent basis. Additionally, **Target Residence 4** also likely contains evidence of drug trafficking activity as well as indicia of a felon in possession of a firearm. Agents have observed Little and Dorsey together at this residence, and two individuals have identified these two men as drug trafficking confederates. Law enforcement has observed activity at this location that, in light of that information, appears consistent with drug trafficking activity – such as the incidents described in Paragraphs 22 and 23 above.

16

Furthermore, information from CS indicates that Dorsey, a convicted felon who lives at **Target Residence 4**, always carries firearms with him. Based on my training and experience, I know that drug traffickers frequently keep contraband - including drug proceeds, firearms, and other assets used to facilitate their drug trade -- at locations over which they control.

27. Moreover, based on my training and experience, I know that drug traffickers frequently engage in the following common practices and activities:

a. It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and cellular services by using other person's names in order to avoid detection by law enforcement officials.

b. It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

c. That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

17

d.   It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

e.   It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business and keep this contraband at their personal residences or at stash houses.

f.   It is common practice that, at their residences or stash houses, drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs.  Drug traffickers commonly front (provide drugs on consignment) to their clients.  The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them, such as their residences or at stash houses.

g.   It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

h.   That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and

businesses the following items: drugs, large amounts of
currency, financial instruments, jewelry, automobile titles,
other items of value and/or proceeds of drug transactions, and
evidence of financial transactions relating to the acquisition
and concealment of large sums of money resulting from drug
trafficking activities.

       i.    When drug traffickers amass large proceeds from
the sale of drugs, they attempt to hide the true source of these
profits, otherwise known as laundering the money. To accomplish
this, drug traffickers many times utilize banks and/or financial
institutions with their attendant services, including but not
limited to, cashier's checks, money drafts, and letters of
credit.  Other entities used to launder drug proceeds include
real estate firms and purported legitimate business fronts.
Drug traffickers frequently keep such records at their
residences or at stash houses.

       j.    Drug traffickers commonly travel to facilitate
their trafficking activities. After purchasing drugs,
traffickers commonly transport, or cause to be transported,
drugs to areas in which they will be distributed. Common methods
of transportation include, but are not limited to, commercial
airlines, and rental/private automobiles.  Drug traffickers

frequently keep records relating to such travel at their residences or at stash houses.

k.    It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization.  This information can often be stored in cellular phones in places such as the contacts list.  Drug traffickers frequently keep such materials at their residences or at stash houses.

l.    Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences, businesses, stash houses of drug traffickers.  Photographs such as these can commonly be found and stored in cellular phones and other electronic media, such as computers and tablets.

m.    Drug traffickers commonly have in their possession, (that is on their person, at their residence, stash houses, and/or their business) weapons, including firearms of various types.  Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to,

narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

n.    Drug traffickers frequently maintain hidden compartments within their residence, stash houses and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

o.    The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone.  These details are usually agreed upon during face-to-face transactions.  For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations.  Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another.  When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers.  The wholesale distributors often have more

21

than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors.  The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates.  Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

p.    Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

q.    I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone."  The money phone is used primarily to communicate with those customers.  The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed.  The trafficker will many times

field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away. Drug traffickers often maintain money phones at their homes, stash houses, businesses or on their person.

Based on the foregoing, I respectfully submit that there is probable cause to issue search warrants for the above-described location

*Steven Lucas*
Steven Lucas
Special Agent
Drug Enforcement Administration

Sworn and subscribed before me on the __11th__ day of __September__ 2020.

Sharon L. Ovington
United States Magistrate Judge

23

ATTACHMENT A

236 Southerly Hills Drive, Englewood, Ohio, including any outbuildings, garages, sheds or curtilage at this location. The residence is depicted below:



ATTACHMENT B

507 S Euclid Avenue, Dayton, Ohio, including any outbuildings and curtilage at this location. The residence is depicted below:



ATTACHMENT C

1107 Rossiter Drive, Dayton, Ohio, including any outbuildings and curtilage at this location. The residence is depicted below:



<u>ATTACHMENT D</u>

**4215 Sheller Avenue, Dayton, Ohio, including any**

**outbuildings and curtilage at this location.**  The residence is

depicted below:



ATTACHMENT E

**249 Shank Avenue, Dayton, Ohio, including any outbuildings and curtilage at this location.** The residence is depicted below:



28

ATTACHMENT F

I submit that there is probable cause to search for the
following items:

    A.    Log books, records, payment receipts, notes, and/or
        customer lists, ledgers, and other papers or electronic
        records relating to the transportation, ordering,
        purchasing, processing, and distribution of controlled
        substances.

    B.    Papers, tickets, notices, credit card receipts, travel
        schedules, travel receipts, passports, and/or records,
        and other items relating to domestic and foreign travel
        to obtain and distribute narcotics and narcotics
        proceeds, including, but not limited to airline
        receipts, vehicle rental receipts, credit card receipts,
        travel schedules, diaries, hotel receipts, truck logs,
        travel agency vouchers, notes, records of long distance
        telephone calls, e-mail and other correspondence.

    C.    Address and/or telephone books and papers reflecting
        names, e-mail and physical addresses and/or telephone
        numbers of individuals, partnerships, or corporations
        involved in drug trafficking and money laundering.

D.  Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E.  Electronic equipment such as pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios.

F.  United States currency, precious metals, coins bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G.  Proceeds of drug trafficking activity or any items used to facilitate drug trafficking activity, including automobiles.

H.  Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

I. Indicia of occupancy, residency, and/or ownership of the premises, and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, vehicle registrations and documentation regarding storage units/lockers.

J. Illegal drugs, including, but not limited to fentanyl, methamphetamine, heroin and other controlled substances, and other tools used in the drug trade, including, but not limited to, scales, vacuum sealers, packaging material, presses, razor blades and cutting agents.

K. Firearms and ammunition.

L. Any computers, cellular telephones, tablets or electronic devices that may contain the above-described documents or items in electronic format.

M. Text messages, instant messages and the like that concern or relate to drug trafficking activity, including, but not limited to, sale prices, drug quantities, customers, sources of supply, or storage locations.

N. Records, documents, or items reflecting indicia of occupancy or ownership at a residence.